### KING COUNTY LAND AND LIVE STOCK COMPANY ET AL. v. R. M. THOMSON.

Decided June 21, 1899.

**1.  Amendment During Trial.**

It is not necessarily reversible error to permit an amendment necessary to plaintiff's recovery to be filed after the parties have announced ready and introduced all their evidence.

**2.  Same—Burden of Proof.**

Where the defense to a suit upon notes of a corporation was based on a restriction, by agreement of its stockholders, of the power of the company to create indebtedness to such an amount, the burden was on defendant to show the considera-

tion, and that the notes created a debt so provided against; an amendment by plaintiff showing the original consideration to be, not a new debt, but a renewal of one existing before the restriction on the power was made, was not necessary to his recovery, and it was not prejudicial error to allow it to be made during the trial.

3.　Corporation—Agreement by Stockholders—Creation of Debt.

On a sale of one-fourth of the stock of a corporation, indebted at the time over $100,000, it was agreed between the purchaser and the other stockholders that no debt should be created by such corporation to exceed $20,000, without the consent of four-fifths of all the stock. Held, that notes in renewal of indebtedness existing before such purchase and agreement, executed to stockholders holding same, were not prohibited by the agreement, and constituted a valid claim against the corporation and its property, though authorized by the vote of less than four-fifths of the stock.

4.　Corporation—Stockholders—Release of Lien.

The rights of a stockholder in a corporation were not injuriously affected by the act of another stockholder holding a claim against it, in releasing his lien therefor on certain property of the corporation, and enforcing it only as a general claim.

5.　Amendment.

An amended answer filed on the day of trial, seeking to make new parties and have them cited, without excuse for not having done so sooner, was properly struck out on exception.

6.　Sale of Land—Deficiency in Quantity.

A shortage of sixty-two acres in a sale of a body of land containing over 39,000 acres is not unreasonable to expect, and should not be regarded as material.

APPEAL from Travis. Tried below before Hon. R. E. BROOKS.

*Eugene Williams,* for appellant.

*Rector & Rector,* for appellee.

KEY, ASSOCIATE JUSTICE.—On March 9, 1886, the King County Land and Live Stock Company, a private corporation, and Ike T. Pryor purchased the properties of the Phoenix Land and Cattle Company, the King County Land and Live Stock Company acquiring a three-fourths and Pryor a one-fourth interest therein.

In payment for the property referred to, the King County Land and Live stock Company executed certain promissory notes. March 30, 1886. Ike T. Pryor purchased 250 shares of stock of the King County Land and Live Stock Company; and at the same time the following agreements were made:

"*The State of Texas, County of Travis.*—Whereas, I. T. Pryor, of said county and State, has this day bought from J. B. Rector, W. J. Montgomery, R. M. and T. A. Thomson, also of said county and State, sole stockholders in the King County Land & Live Stock Company, two hundred and fifty (250) shares of one hundred ($100) dollars each, out of the one thousand shares of issued and paid up stock of said company;

"And whereas, the hereinafter stipulations 1, 2, 3, and 4 entered into and constituted an inducement and consideration for the sale and purchase of said stock, it is therefore agreed:

"First. That neither of the said parties hereto shall sell the stock owned by them to a non-stockholder without giving all the other parties hereto an opportunity to purchase on the same terms;

"Second. That no debt or liability shall be created by said corporation to exceed twenty thousand dollars ($20,000) without the consent of four-fifths ($\frac{4}{5}$) of all the stock.

"Third. Said I. T. Pryor hereby binds himself, his executors, administrators, in the event that either of the other parties hereto are compelled by virtue of their individual indorsement on certain bonds issued by said company to Nelson & Noel of St. Louis, Missouri, March 1st, 1886, and amounting in the aggregate to fifty thousand ($50,000) dollars to pay any part of said bonds, that he will refund to the party or parties so paying one-fourth ($\frac{1}{4}$) of what they may be compelled to pay, provided, in no event shall he be compelled to pay more than one-fourth ($\frac{1}{4}$) of the whole amount which the other parties may be compelled to pay. This stipulation is based upon the fact that said Pryor has received one-fourth ($\frac{1}{4}$) of the amount realized for said bonds, and said Pryor takes his stock subject to the existence of the mortgage on the property of the company, made to secure said bonds, and stands in this respect on the same footing with the other parties hereto.

"Fourth. In the purchase of said two hundred and fifty (250) shares of stock by said Pryor, it is expressly understood that he becomes a stockholder and member of said corporation upon an equal footing, in all respects, with the other stockholders, and entitled to have and enjoy all property rights, and all privileges of every character whatsoever belonging to the other parties hereto, to the extent of the stock acquired by him in said corporation. Executed by signing five copies hereof, each party retaining a copy, and each being deemed an original. This the 30th day of Mch., 1886.

"R. M. THOMSON,
"W. J. MONTGOMERY,
"IKE T. PRYOR,
"JOHN B. RECTOR."

Though not signed by T. A. Thomson, the above contract was shown to be binding on him.

"*The State of Texas, County of Travis.*—Know all men by these presents, that I, Ike T. Pryor, of said State and county, in part consideration of 250 shares of stock of $100 each of the King County Land & Live Stock Co., this day conveyed, transferred, and assigned to me by W. J. Montgomery, R. M. Thomson, T. A. Thomson, and John B. Rector, all of said county and State, I hereby transfer, set over, and assign to said King County Land & Live Stock Co. all the property and rights of property in land, cattle, horses, mules, equipments, etc., acquired by me under and by virtue of a certain contract and conveyance made by me and the King County Land & Live Stock Co. on the one side, and the Phoenix Land & Cattle Co. on the other; said instrument being dated on the 9th day of March, 1886, and signed also by the stockholders of the said Phoenix Land & Cattle Co., to wit: by R. E. Mabry, S. R. Crawford, and

W. G. Mellier; and the said King County Land & Live Stock Co. is hereby authorized and empowered to take deeds, bills of sale, etc., direct to itself, to all the property aforesaid to which I am entitled under said contract. Witness my hand, this March 30th, 1886.

(Signed)     "Ike T. Pryor."

The total balance owing for the property purchased from the Phoenix Land and Cattle Company was $108,365.19; and on December 9, 1886, the King County Land and Live Stock Company executed nine promissory notes, payable to S. R. Crawford, R. E. Mabry, and W. G. Mellier, aggregating the amount above stated. Said notes were secured by mortgage on the cattle purchased from the Phoenix Land and Cattle Company, estimated at 12,000 head.

On January 1, 1892, there was a meeting of the stockholders of the King County Land and Live Stock Company, when the secretary reported to the meeting the purchase of fifty-one head of horses from I. T. Pryor, for the sum of $2295. At this meeting all the stockholders were present, and on motion of Pryor the following preamble and resolution were unanimously adopted.

"Whereas, on the 9th day of December, 1886, the company made and delivered to one W. G. Mellier its two certain promissory notes, each for $12,155.55, each bearing 10 per cent interest from November 20, 1886, and payable respectively on or before Nov. 20th, 1888 and 1889; and whereas on May 19th, 1888, the company executed to Thomson Bros. and Pryor a certain other note for $6155.55, payable on or before Nov. 20th, 1889, with 10 per cent interest from November 20th, 1886, which said last note represented that much of a certain note executed by said company on the said 9th of December, 1886, for $12,155.55, payable to S. R. Crawford, on or before Nov. 20th, 1889, each of which notes were secured by the company's mortgage on about 12,000 head of cattle and their increase, in King County, Texas, each and all of which notes were also signed by each of the stockholders of the company, to wit: W. J. Montgomery, Jno. B. Rector, I. T. Pryor, and R. M. and T. A. Thomson; and whereas each of said notes are now due and are held and owned by said Montgomery and Rector (who owned each one-third) and R. M. and T. A. Thomson, who owned the other one-third, upon which said notes there is due

"On the first note ........................$18,534 28
"On the second note ..................... 18,534 28
"On the third note ...................... 9,486 98—$46,555 54.

"And whereas, it was agreed that the $2295 due by the company to I. T. Pryor for horses, should go as a credit on the foregoing indebtedness at the rate of $3 for $1, or $6885, leaving a balance due by said company on said notes of $39,670.53; wherefore, be it resolved that said amount constitutes a just and valid claim and debt against the company, secured by its mortgage on the cattle and their increase, amounting to about 12,000 head, located in King Co., Texas, which mortgage is a valid

subsisting mortgage, but the property is to be subject first to a subsequent mortgage or trust deed to secure $50,000 in bonds, executed to Lewis Hancock, as trustee; second, that the president execute the note or notes of the company under its corporate seal and attest it by the secretary and treasurer, for the amount of said indebtedness, due on or before three years after date, with 8 per cent interest, the interest to be paid annually or to become as principal; which notes may be in such sums as the said parties may desire, and payable to all, or the amounts may be divided in separate notes, and in case one of the notes be executed to W. J. Montgomery, then the vice president shall execute the same; which notes shall express and show that they represent the original indebtedness which were secured by the said originals, and that the new notes be secured by the same, and that the old notes be preserved to show how the indebtedness occurred and the security preserved."

In pursuance of said resolution, notes were executed as follows:

"$13,223.51.                          AUSTIN, TEXAS, Jan. 1st, 1892.

"Three years after date, for value received, the King County Land & Live Stock Co. promises to pay to the order of John B. Rector, at his office in the city of Austin, Texas, thirteen thousand two hundred and twenty-three and 51/100 dollars, with interest from date hereof until paid, at the rate of 8 per cent per annum, the interest payable annually, and if not so paid to become as principal and bear interest at the same rate as principal. This note is given for one-third of amount due on three notes executed by the company, two dated Dec. 9th, 1886, payable to W. G. Mellier, each for $12,155.55, due respectively Nov. 20th, 1888, and Nov. 20th, 1889, and the other for $6155.55, dated May 19th, 1888, payable to Thomson Bros. and Pryor on Nov. 20th, 1889, all of the notes bearing 10 per cent interest from November 20th, 1886, and secured by the company's mortgage on 12,000 head of cattle and the increase, in King County, Texas, which mortgage exists and is alive, and this note and one other for like amount and two others each for one-half of this amount, are secured by said mortgage on said cattle and their increase. This note is executed in its corporate name and under its seal by its president and secretary.

[Seal.]          "THE KING COUNTY LAND & LIVE STOCK CO.
                        "Per W. J. Montgomery, President.
"Attest: R. M. THOMSON, Secretary."

This note is indorsed with the following credits: "Apr. 8th, 1896, $1200; Apr. 27th, 1896, $3050." This note is also indorsed as follows: "This note is canceled by a new note, dated Apr. 27th, 1896, for $14,200 (fourteen thousand two hundred dollars). John B. Rector."

The note to W. J. Montgomery of January 1, 1892, is exactly similar to the John B. Rector note and has similar indorsements upon the back thereof, except that Montgomery makes the indorsements instead of Rector.

The note executed to Thad A. Thomson is as follows:

"$6611.75.                Austin, Texas, Jan. 1st, 1892.

"Three years after date, for value received, the King County Land & Live Stock Co. promises to pay to the order of Thad. A. Thomson, at his office in the city of Austin, Texas, ($6611.75) six thousand six hundred and eleven and 75/100, with interest from date hereof until paid, at the rate of 8 per cent per annum, the interest payable annually, and if not so paid to become as principal and bear interest at the same rate as principal. This note is for one-sixth of amount due on three notes executed by the company, two dated Dec. 9th, 1886, payable to W. G. Mellier, each for $12,155.55, due respectively Nov. 20th, 1888, and Nov. 20th, 1889, and the other for $6155.55, dated May 19th, 1888, payable to Thomson Bros, and Pryor on Nov. 20th, 1889, all of the notes bearing 10 per cent interest from November 20th, 1886, and secured by the company's mortgage on 12,000 head of cattle and the increase, in King County, Texas, which mortgage exists and is alive, and this note and one other for like amount and two others each for double the amount of this, are secured by said mortgage on said cattle and their increase. This note is executed in its corporate name and under its corporate seal by its president and secretary.

    [Seal.]         "The King County Land & Live Stock Co.
                   "Per W. J. Montgomery, President.
"Attest: R. M. Thomson, Secretary."

The note is indorsed with the following credits: "Apr. 8th, 1896, $1050. Apr. 27th, 1896, $1075." The note is also indorsed: "Credit by new note for balance due, viz., $7100, Apr. 27/96." Across the face of said note is indorsed: "Canceled by new note of even date of last credit herewith for $7100, payable two years after date. This Apr. 27/96.— T. A. Thomson, per R. M. Thomson."

The note to R. M. Thomson of January 1, 1892, was for like amount as the Thad. A. Thomson note and in all respects similar, including the credits and indorsements thereon.

The notes referred to as being renewed by the notes of January 1, 1892, were introduced, and across the face of the Mellier note, due November 20, 1889, was the following indorsement: "This note and two other notes renewed Jan. 1, '92, see Ledger, p. 127, and placed in four notes, one to W. J. Montgomery for $13,223.51, John B. Rector $13,-223.51, R. M. Thomson and T. A. Thomson, two notes, $6611.75½ each. The new notes retaining the same lien as the old."

The minute book of the stockholders of the King County Land and Live Stock Company shows that a meeting was held on April 27, 1896, at which there were present W. J. Montgomery, R. M. and T. A. Thomson, and John B. Rector was represented by his proxy, W. J. Montgomery, duly authorized by power of attorney; and "it appears from the minutes of said meeting that the State National Bank of Austin presented to the

stockholders two notes held and owned by it, executed by the company, one to Thad. A Thomson for $6611.75, and one to R. M. Thomson for like amount, bearing date Jan. 1, '92, by virtue of a resolution of the stockholders on the 1st day of Jan., 1892, and demanded payment of same, with accrued interest, but expressed a willingness to carry said indebtedness if the company would execute new notes for the principal and interest then due. On motion it was duly resolved, by a vote of all the stockholders represented, and being three-fourths of the entire stock, that the president be and he is hereby instructed and authorized to execute, in the name of the company and under its corporate seal, its two promissory notes, each for $7100, one payable to Thad. A. Thomson and the other to R. M. Thomson, two years after date, to bear interest from date at eight per cent per annum, and providing that the interest be made payable annually, and if not paid to be added and become principal and to bear interest as principal, it being resolved that said sum of $7100 was justly due by the company upon each of said notes. It was further provided that the said notes of Jan. 1, '92, be indorsed canceled by these new notes, and that the old notes be preserved, so as to clearly identify the transaction; and it further appearing to said stockholders that there were two other notes executed by the company at the same time and under the same resolution, each for $13,223.51, one payable to W. J. Montgomery and the other to John B. Rector, with eight per cent interest per annum, as stated in the Thomson note, and that there is now justly due upon each of said notes $14,200, bearing 8 per cent interest,—it was resolved that the company, through its officers, execute to W. J. Montgomery and John B. Rector each, a note for said amount of that date, and that the notes of Jan. 1st, '92, be canceled across their face and preserved, so as to show the identity of the transaction."

The minute book further shows another meeting held on November 24, 1896, "at which meeting it is recited that the following stockholders of said corporation were present, to wit, W. J. Montgomery, John B. Rector, I. T. Pryor, R. M. Thomson, and T. A. Thomson, owning over three-fourths of all the capital stock of said company, and also being over three-fourths of stockholders, at which meeting the secretary and treasurer reported that in pursuance of the resolution of April 27th, 1896, with reference to the indebtedness of the company to the parties below named, that the following promissory notes had been duly executed and delivered, to wit.

| | |
|---|---|
| "T. A. Thomson | $7,100 |
| "R. M. Thomson | 7,100 |
| "Jno. B. Rector | 14,200 |
| "W. J. Montgomery | 14,200 |

being amounts due to each respectively, as shown by said resolution; each of the new notes are dated April 27, 1896, and bear interest at the rate of 8 per cent per annum from date of note, payable annually, or to be added in and become as principal and bear same rate of interest, and also that each of the old notes had been canceled, so as to show the whole trans-

action, and filed with the company's papers; which report was unanimously ratified and confirmed."

It was also shown that on May 19, 1888, at a meeting of the stockholders of said company, a resolution was unanimously passed, authorizing the company to execute to Thomson Bros. and Pryor two notes, one for $6155.55 and one for $6000, payable on or before November 20, 1889, with 10 per cent interest from November 20, 1886, being in lieu of note No. 1 of series No. 3 to S. R. Crawford for $12,155.55; and that said Crawford note be canceled, and that the new notes held by Thomson Bros. and Pryor be secured as the Crawford note was, and take its place in said mortgage, and that the company had executed the notes authorized by this resolution.

The notes sued on are as follows:

"$14,200. No. ——.          Austin, Texas, April 27, 1896.

"On or before two years after date the King County Land & Live Stock Co. promise to pay to the order of John B. Rector, in Austin, Texas, fourteen thousand two hundred dollars, for value received, with interest from date at the rate of eight per cent per annum, payable annually; and if interest be not paid when due to become as principal and bear same rate of interest.

"This note is given under a resolution of the board of stockholders this day adopted, and is given as renewal of a note executed by said company to John B. Rector the first day of January, 1892, for $13,223 & 51/100 dollars, and this note shall have all the rights and liens it had under and by virtue of said note of Jan. 2nd, 1892.

"In witness whereof, the company signs its name by its president and causes it to be attested by the secretary under the seal of the company.

    [Seal.]         "The King County Land & Live Stock Co.

                "Per W. J. Montgomery, President.

"Attest: R. M. Thomson, Secretary."

This note is endorsed with the following credits: "July 17th, 1897, interest paid to Apr. 27th, 1897, $1136." Also the following credits: "Received from the estate of L. A. Ellis, decd., $1666.66⅔ dollars, and carrying out the provisions of sec. 3 of a contract dated Feb. 19th, 1898, between the holders of stocks of the King County Land & Live Stock Company, a further credit of five thousand dollars ($5000) is made on the note, making a total credit of $6666.66⅔. June 2nd, 1898. (Signed) Mrs. L. B. Rector, per N. A. Rector, agent."

Said note is also indorsed in blank by said L. B. Rector, per N. A. Rector, agent and attorney in fact.

The note to W. J. Montgomery is in all respects similar to that of the J. B. Rector note and indorsements and credits thereon the same, except that the one year's interest was paid on May 19, 1897. It was also indorsed in blank by W. J. Montgomery.

The R. M. Thomson note was as follows, to wit:

"$7100.                              Austin, Texas, Apr. 27th, 1896.

"On or before two years after date the King County Land & Live Stock Co., a corporation created under the laws of the State of Texas, promise to pay to the order of R. M. Thomson, at the State National Bank in the city of Austin, Texas, seven thousand one hundred dollars, for value received, with interest from date at the rate of eight per cent per annum, interest payable annually, or to become as principal and bear the same rate of interest.

"In witness whereof, the president hereto signs the name of the company by him as president, and has caused the corporate seal to be hereto attached, this the 27th day of April, 1896.

[Seal.]          "The King County Land & Live Stock Co.
                              "By W. J. Montgomery, President.
"Attest: R. M. Thomson, Secretary."

This note is indorsed with the following credits: "May 11th, 1897, interest, $568, paid to Apr. 27th, 1897.  Received from the estate of L. A. Ellis, this day, eight hundred and thirty-three and 33⅓ dollars ($833.33⅓) and carrying out the provisions of sec. 3 of contract dated Feb. 19th, 1898, between the holders of stock of King County Land & Live Stock Co. a further credit of ($2500) two thousand five hundred dollars is made on this note, making total credit of $3333.33⅓.  June 2nd, 1898."

The T. A. Thomson note was similar in every respect to the R. M. Thomson note, with similar indorsements of credits.

The notes above referred to, dated April 27, 1896, were all indorsed to R. M. Thomson.

February 19, 1898, the following agreement was entered into.

"*The State of Texas, County of Travis.*—Whereas, R. M. Thomson, Thad. A. Thomson, W. J. Montgomery, and Jno. B. Rector, of said State and county, hold several notes executed by the King County Land & Live Stock Company, due April, 1898, aggregating about forty-two thousand dollars, together with accrued interest thereon, providing for attorney's fees therein.

"And whereas I. T. Pryor, of the county of Bexar, said State, was once a stockholder in said company, owning one-fourth of the capital stock, which it is claimed by the devisees of L. A. Ellis, was heretofore transferred to L. A. Ellis, of said county of Travis, to secure an indebtedness due by said Pryor to said Ellis.

"And, whereas, the said Ellis has departed this life, leaving his executrix, Amanda M. Ellis, his surviving widow, and C. G. Ellis, Emmette A. Ellis, India Myrtle Ellis, and Leigh Ellis, of whom said Amanda M. Ellis is guardian, the surviving children of said L. A. Ellis being the only devisees, now the holders and owners of the said stock formerly belonging to the said Pryor.

"And, whereas, said devisees claim that said notes should not be held as a just debt against the property of said company, so far as the same is represented by the one-fourth of the stock held by the said devisees, and that said notes are an unjust burden upon said stock and the property of said company represented thereby.

"And, whereas, said company and the holders of said three-fourths interest in said stock, being the holders of said notes, have agreed with the said devisees upon an adjustment, in part, of the differences between them suggested above, and desire to reduce the same to writing.'

"Therefore, be it remembered, that this agreement witnesseth:

"First. That said company will, on or before the 5th day of March, 1898, convey to C. G. Ellis 39,800 acres of land out of the southern portion of said company's pasture, located in King County, Texas, described as follows:

"Beginning at a point 3091 vrs. south of the N. E. corner of survey 128, in the name of J. B. Rector, and N. W. corner of survey 49 in the name of R. M. Thomson. Thence west 12,014 vrs. to the west line of survey 170, in the name of R. M. Thomson. Thence south, with west line of 170 and 118 to Wichita River, continue S. to S. W. corner of survey 104. Thence S. 45 E. to S. E. corner 12 B. S. & F. Thence with the southern boundary line of the King County Land & Live Stock Co. to S. E. corner of their surveys. Thence north with east boundary line of their surveys to N. E. corner of survey 183. Thence west with south boundary line of M. E. & P. R. R. survey to its S. W. corner. Thence N. to a point due east of S. E. corner of A. Coleman survey. Thence W. to the N. E. corner of 128, and N. W. corner 49. Thence S. 3091 vrs. to the beginning, containing 39,800 acres of land patented, to be conveyed to said Ellis with satisfactory evidence of title, with opportunity of determining that these field notes contain 39,800 acres, in ten days. The dividing line between the land to be conveyed to Ellis and the land of the King County Land & Live Stock Co. is to be established and fenced at the joint expense of both parties or their assigns, whenever either party shall demand it, and it shall remain a joint fence. If practicable, however, the material of the south boundary line of the seven-section pasture may be used in the construction of said fence, and until the fence is established along said dividing line, each party shall be entitled to use the land so lying in the other pasture and pay customary rents to the other if in use or leased by said party.

"Second. That said devisees, upon the receipt of the deed conveying said land to C. G. Ellis, will pay to the said R. M. Thomson and Thad A. Thomson and W. J. Montgomery and Jno. B. Rector, the sum of five thousand dollars, which shall be credited upon said notes, and shall not be repaid to the devisees unless this agreement is violated by the holders of said notes or said company, and then only by the party so violating it, but not the others; and said devisees shall also surrender their one-fourth of said stock.

"Third. That said holders of said notes may at any time on or after

or before their maturity bring what may be considered a friendly, though bona fide, action upon said notes to recover the balance due thereon, after crediting said $5000, and also $15,000 as if paid by said three-fourths stockholders; and in such action, the said Amanda M. Ellis, or all of said devisees or any portion of them, may be made parties to said action, but it shall be obligatory upon the holders of said notes to notify the said devisees or some one of them or Eugene Williams, their attorney, in writing, that such action has been brought.

"Fourth. That on the trial of said action, the only issues to be determined shall be, *first,* whether or not said notes constitute or represent a valid obligation against said company; and *second,* whether or not all the property of said corporation prior to the execution of said deed to C. G. Ellis is liable therefor; *third,* whether the proportion of property owned by said company represented by the stock formerly owned by said Pryor could be made responsible for the said notes or any part thereof. The holders of said notes shall have the right to establish the validity of their debt against said corporation, independent of the question whether said notes technically represent said debt or not; said devisees not admitting the validity of the same; and on said trial the said devisees shall have the right, if they so elect, to make themselves parties to said suit or to defend said suit in the name of the said company, but shall not charge said company anything for attorneys fees, it being intended that this agreement shall stand in lieu of the said 39,800 acres of land, more or less, estimated to be the prorated portion in value of the entire real property owned by said company, which would be represented by said Pryor stock, the said 39,800 acres of land, more or less, being hereby expressly relieved of any character of liability or lien to secure the said notes, so that the said C. G. Ellis may hold the said 39,800 acres of land, more or less, free from any claim by said company on said notes, if any, or any other debt of said company.

"Fifth. And in the event it shall be determined in said suit that the said notes represent a valid obligation against said corporation, and that all of the property of said corporation prior to the date of the deed to C. G. Ellis should be held liable therefor, the said devisees promise to pay at Austin, Texas, to the owners of said judgment, one-fourth of the amount of same, except as otherwise prescribed in the tenth paragraph; provided, however, that the limitation as to attorney's fees mentioned in the seventh paragraph of this agreement is here recognized; it being claimed by said devisees that the said notes are not a just debt against the said company, and especially against their interests therein, as represented by said stock, but being desirous of paying what is justly due the holders of said notes, said devisees obligate themselves as above.

"Sixth. The said company and said three-fourths stockholders shall retain all the remainder of the property of the said company, should the said devisees or the said company defeat said action, but should the holders of said notes recover any amount against the said company which these devisees would be required under this agreement to pay, then any

cash or credits belonging to said company shall be considered as still the assets of said company, thereby giving to said devisees the benefit of the one-fourth interest therein, but all lands other than the 39,800 acres aforesaid shall remain the property of the company.

"Seventh. That should said judgment be such as would require said devisees to make any payment thereupon, they shall pay the costs of court, but the attorney's fee for which they would be responsible, shall not exceed one-fourth of two hundred and fifty dollars, although it may be that said notes provide for a larger sum or a larger fee be fixed by judgment therefor.

"Eighth. The said C. G. Ellis agrees to accept a deed without warranty, made by order of a majority of the directors of said company, the taxes to be paid out of the corporation personal property assets for 1898 and previous years, if any, the balance only of such assets being subject to division, should Ellis be defeated in the suit.

"Ninth. If before or after institution or determination of said suit any of the holders and owners of said mentioned obligations against the King County Land & Live Stock Company should die, partition, or sell a part or all of the property of said corporation remaining after the execution of said deed, such act or acts of said parties or of said corporation shall not in any manner interfere with or affect the issues agreed above to be determined in said suit.

"Tenth. If prior to the institution of said suit or during its pendency, three-fourths of the claim represented by said notes shall be paid by a sale of the lands belonging to said corporation, remaining after the deed to said Ellis, and for such reason said claim or claims shall be reduced to one-fourth the amount now claimed, then in that event the said devisees agree to pay the entire judgment so recovered, if any, after crediting such payments, and paragraph 5 of this agreement is so modified.

"Witness the hands of the said three-fourths holders of said stock, and the said company, by its president, attesting the same with its corporate seal, and the hands of said devisees, in duplicate this the day of February 19th, A. D. 1898.

"C. G. ELLIS."                           "AMANDA M. ELLIS,
"THE KING Co. LD. & L. S. Co.,          "INDIA M. ELLIS,
    "Pr. W. J. Montgomery, Prest.       "LEIGH ELLIS,
"W. J. MONTGOMERY,                       "EMMETTE A. ELLIS,
"R. M. THOMSON,                          "P. A. TURNER,
"THAD A. THOMSON,                        "D. A. TURNER,
"JOHN B. RECTOR,                             "By their atty. in fact, C. G.
    "Per Mrs. John B. Rector."          Ellis.

July 23, 1898, R. M. Thomson brought this suit against the King County Land and Live Stock Company, Amanda M. Ellis, individually and as executrix of the estate of L. A. Ellis, deceased, and the children and devisees of L. A. Ellis, deceased. The suit was founded upon the notes of date April 27, 1896, and the agreement, dated February 19, 1898.

The notes made payable to Rector, Montgomery, and T. A. Thomson, had been transferred to the plaintiff as a matter of convenience.

The answers of the defendants, as well as the pleadings filed by the plaintiff, are quite voluminous, and we deem it unnecessary to set them out in detail. A judgment was rendered for the plaintiff, and the defendants have appealed.

There is scarcely any conflict in the testimony, and therefore we have deemed it unnecessary to file formal conclusions of fact on every phase of the case. Some other facts may be referred to hereafter.

*Opinion.*—Appellants complain of the action of the court in permitting the plaintiff to file a trial amendment, after the parties had announced ready for trial and had introduced all their testimony. The court permitted the amendment to be filed, as stated. The amendment pleaded in detail the execution of the notes dated January 1, 1892, and alleged that the notes sued on were given in lieu of the former notes, and prayed, in case it be determined that the notes sued on in the original petition did not technically represent the original indebtedness, that the plaintiff recover on the original indebtedness.

Under the very liberal rule established by our Supreme Court (Telegraph Company v. Bowen, 84 Texas, 479) we doubt if this should be held reversible error, even if the trial amendment was necessary to the plaintiff's right to recover. However, we do not regard the amendment as necessary. The original petition charged that the defendant company, being justly indebted therefor, executed the notes sued on. The petition made a prima facie case. It alleged facts showing liability against the defendants, and it did not devolve upon the plaintiff to plead the transactions antecedent to the execution of the notes sued on. The notes sued on do not, in terms, evidence the creation of new debts. For aught that appears on their faces, they may have been given for debts created prior to the agreement of March 30, 1886. Hence, the burden rested upon the defendants not only to plead and prove the agreement, but to explore the consideration of the notes, and show that they created a debt or liability against the corporation that did not exist at the time the agreement was made.

Several assignments of error attack the validity of the notes sued on, upon the ground that they created a debt or liability against the corporation exceeding $20,000, without the consent of four-fifths of all the stock, as required by the agreement of March 30, 1886.

Counsel for appellants claims that at the time the stockholders attempted to authorize and ratify the execution of the notes sued on, Ellis was the owner, or had such interest in the stock formerly owned by Pryor as subrogated him to Pryor's rights under the contract referred to, and that as Ellis did not consent to the execution of said notes, and as they created a debt exceeding $20,000, they were unauthorized and void, because prohibited by the second section of the contract.

The testimony shows that Pryor had previously placed his stock with Ellis, as collateral security for borrowed money, and that in August, 1894, all of Pryor's stock, except one share, had been transferred on the books of the company to Ellis. However, it is not very clear from the testimony whether at the time the notes in suit were executed Ellis was the absolute owner of the stock, or held it as collateral security for his debt. But whether as absolute owner or as pledgee, it may be that he had such interest in the stock as would require his consent to the creation of a new debt in excess of $20,000. Assuming that he had such interest, we agree with counsel for appellee that the execution of the notes sued on was not the creation of a new debt or liability within the purview of the contract referred to; and therefore the consent of four-fifths of all the stock was not required to authorize the corporation to execute the notes.

The contract is to be construed in the light of the facts existing and known to the parties at the time it was made. Pryor knew that the corporation was in debt at the time he bought into it. He could not, by any contract between him and the corporation, or between him and the other stockholders, release his interest from existing liability to the creditors of the company, and he doubtless knew that fact. He realized, however, as shown by the testimony, that, as he was only acquiring a one-fourth interest, he could not prevent the creation of new debts, unless there was a valid agreement, requiring the vote of more than three-fourths of the stock to create such debt; and it was to protect him in this respect that section 2 was placed in the contract.

There is nothing on the face of the contract, or disclosed by the testimony in reference to the circumstances then existing, to indicate that Pryor felt any concern about the form of the pre-existing indebtedness,— whether the outstanding notes of the company remained payable to the creditors then holding them, or whether new notes for the same indebtedness were executed, payable to the same or other persons; and we think it would be a strained construction of the contract to hold that the execution of new notes for the same debts, though payable to other persons than those named in the former, would be a violation of the contract.

We therefore hold that the execution of the notes sued on did not create a new debt or liability within the meaning of the contract, and that said notes are valid obligations against the King County Land and Live Stock Company and all of its property.

It is also urged, that there having been a renewal of the indebtedness and release of the lien on cattle securing the debt, and appellee and Montgomery, as officers of the company, having received the proceeds of the sale of the cattle released from the lien, and confused the same with other funds of the company, the Ellis stock is released from liability. There is no merit in this contention. The Ellis estate occupies no better position than that of stockholder in the corporation; and it is not shown that any funds or other property of the corporation have been misapplied or diverted by Thomson or anyone else. If appellee and his associates saw proper to release liens by which their debts were secured, such action on

their part could not injuriously affect the owner or holder of the shares of stock formerly owned by Pryor.

Nor did the court err in sustaining exceptions to so much of appellants' amended answer as sought to offset or recover the sum of $2000 alleged to be due by the corporation to Pryor; and $1250, claimed for personal property, or the proceeds thereof, alleged to be held by Thomson as trustee. The pleading referred to was filed on the day of trial, and it sought to make new parties and have them served with citation, without offering any excuse for not having done so sooner.

Nor was error committed in failing to allow appellants anything as damages resulting from shortage, conflict, and failure to get possession of portions of the 39,800 acres of land referred to in the agreement of February 19, 1898. The testimony will support a finding, and we therefore find that in accepting the deed referred to appellants took the risk of the number of acres. Besides, the shortage, if any, was not shown to exceed sixty-two acres, which, in surveys aggregating over 39,000 acres, is not unreasonable to expect, and should not be regarded as material. The evidence tending to show conflict as to ninety-two acres was unsatisfactory, especially as to the number of acres in conflict; and the testimony fails to show that any other person is rightfully in possession of any of the remainder of the 39,800 acres.

No reversible error has been shown and the judgment will be affirmed.

*Affirmed.*

Writ of error refused.